Filed 4/14/22 In re S.F. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.F. et al., Persons Coming Under the Juvenile Court Law. | B313125 (Los Angeles County Super. Ct. No. 18CCJP05482A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.F.,<br><br>Defendant and Appellant. | |

APPEAL from the orders of the Superior Court of Los Angeles County.  Steff R. Padilla, Judge Pro Tempore.  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Stephanie F. (mother) argues that she did not receive proper notice of the permanency planning hearing at which the juvenile court terminated her parental rights over her two children because the Los Angeles Department of Children and Family Service (the Department) sent the notice via certified mail rather than certified mail with a return receipt requested.  This defect in notice is harmless because mother's presence at the hearing could not have changed its outcome.  We accordingly affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.  Facts

Mother and Mario G. (father) have two children—Sebastian (born May 2018) and Nehemiah (born April 2019).

In April 2018, father was arrested after he pushed mother repeatedly, causing her to fall to the ground.  Mother was nine months pregnant at the time.  Father also has a history of domestic violence with his prior partner, which resulted in the permanent placement of Sebastian and Nehemiah's half siblings in a prior proceeding.  In July 2018, mother and father shoplifted from a store using Sebastian's stroller (with him in it) to hide the

merchandise. Father has a long history of substance abuse and was currently abusing "morphine, codeine, amphetamine, methamphetamine and marijuana."

## II. Procedural History

### A. *Proceedings regarding Sebastian through the termination of reunification services*

In August 2018, the Department filed a petition asking the juvenile court to exert dependency jurisdiction over Sebastian due to his parents' domestic violence, their shoplifting with him, and father's substance abuse. The petition alleged that this conduct placed Sebastian at substantial risk of serious physical harm, rendering jurisdiction appropriate under subdivisions (a) and (b)(1) of Welfare and Institutions Code section 300.[1, 2]

Mother appeared at the detention hearing, and was appointed the Law Offices of Rachel Ewing (the Ewing Firm) as her attorney of record; Olga Matemotja appeared from that firm.

In January 2019, the juvenile court held a jurisdictional hearing. Mother's attorney of record appeared; despite receiving proper notice, mother did not appear. The juvenile court sustained all three grounds for jurisdiction, but did so solely under subdivision (b)(1) of section 300.

In March 2019, the juvenile court held a dispositional hearing. The court removed Sebastian from mother's custody

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The petition also alleged that jurisdiction was appropriate under subdivision (j) of section 300 based on endangerment to Sebastian's half siblings due to father's violent conduct towards their mother.

3

and ordered the Department to provide mother with reunification services.

In March 2020, the juvenile court held the 12-month review hearing to assess mother's progress with reunification services. Attorney Lori Davis of the Ewing Firm appeared; despite receiving proper notice, mother did not appear. After concluding that mother was not adhering to the case plan assigned to avail herself of the reunification services, the juvenile court terminated those services and set a permanency planning hearing for June 29, 2020.

**B.** *Proceedings regarding Nehemiah through the termination of reunification services*

In June 2019, the Department filed a petition asking the juvenile court to exert dependency jurisdiction over Nehemiah on the same grounds alleged in the petition for Sebastian, except that the Department urged the court to exercise jurisdiction under subdivisions (b)(1) and (j) of section 300. The Department filed an amended petition later that month, adding a new allegation regarding mother's conviction for felony evading a peace officer.

Mother appeared at the detention hearing, and Ewing Firm was appointed as her attorney of record; Lori Davis appeared from the firm.

In July 2019, the juvenile court held back-to-back jurisdictional and dispositional hearings regarding Nehemiah. Mother and her attorney of record appeared. The court sustained jurisdiction on all alleged grounds, but did not remove Nehemiah from mother's custody (as he was not yet three months old). The court ordered the Department to provide family maintenance services.

4

After mother used methamphetamines in October 2019, the Department filed a supplemental petition alleging that jurisdiction was also warranted due to mother's use of drugs while caring for Nehemiah and seeking to remove him from her custody. In January 2020, the juvenile court held a hearing on the supplemental petition. Mother's attorney of record, the Ewing Firm appeared; despite receiving proper notice, mother did not appear. The court sustained the petition, removed Nehemiah from mother's custody, and ordered the Department to provide mother reunification services.

On January 8, 2021, the juvenile court held the 18-month review hearing to assess mother's progress with the reunification services. Mother's attorney of record, the Ewing Firm appeared; despite receiving proper notice, mother did not appear. Mother was not in compliance with the case plan—she had not drug tested, and had not visited Nehemiah. The court concluded mother's progress was unsatisfactory, terminated reunification services and set a permanency planning hearing for May 4, 2021.

C. *Post-termination proceedings*

On May 8, 2020, and due to the COVID-19 pandemic, the juvenile court issued a minute order continuing the permanency planning hearing scheduled for Sebastian on June 29, 2020, to February 3, 2021.

At the February 3, 2021 hearing, mother's attorney of record, the Ewing Firm appeared; despite receiving proper notice, mother did not appear. The juvenile court continued the permanency planning hearing for Sebastian to May 4, 2021—the same day already set for Nehemiah's permanency planning hearing.

In anticipation of the permanency planning hearings for Sebastian and Nehemiah, the Department served mother with notice of those hearings by mailing her notice through certified mail, but the Department did not request a return receipt.

On May 4, 2021, the juvenile court held the permanency planning hearings for both Sebastian and Nehemiah. Mother's attorney of record the Ewing Firm was present, albeit a different lawyer from the firm appeared than had appeared previously. Mother did not appear, and her attorney did not raise any defect in the notice given mother or express in any way that she was not prepared for the hearings. The court found both children adoptable, found no applicable exception, and terminated mother's parental rights over each child.

### D.    *Appeal*

Mother filed this timely appeal to both termination orders.

### DISCUSSION

Mother argues that the orders terminating her parental rights over Sebastian and Nehemiah must be vacated because the Department did not comply with the notice requirements set forth in section 294 and because this lack of compliance amounts to a violation of due process.[3]  Our review is de novo because mother's arguments raise questions of statutory and constitutional interpretation (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 225 [statutory interpretation]; *Aquila, Inc.*

---

[3]    The Department argues that mother forfeited her right to raise the notice issue on appeal because she did not object before the juvenile court, where any defects in notice could have been addressed. Although the failure to raise an issue in these circumstances can constitute a waiver (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754), we exercise our discretion to reach the merits (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6).

*v. Superior Court* (2007) 148 Cal.App.4th 556, 568 [constitutional analysis of notice]), and involve the application of that law to undisputed facts (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912-913).

## I.    Applicable Law

In juvenile dependency proceedings, "[n]otice is both a" "statutory" and "constitutional" "imperative."  (*In re J.H.* (2007) 158 Cal.App.4th 174, 182 (*J.H.*); *In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1114 (*Jasmine G.*).)

### A.    *Statutory notice requirements*

The permanency planning hearing is the last step in a juvenile dependency proceeding.  It occurs only *after* the juvenile court has exerted dependency jurisdiction over a child (see § 300), *after* the court has removed the child from the parent (see § 361, subd. (c)), and *after* reunification services have been terminated (or, in narrow, statutorily defined circumstances, bypassed altogether) (see § 361.5).  In other words, the permanency planning hearing occurs only after the juvenile court has determined that the parent is either unwilling or unable to address the issues that necessitated dependency jurisdiction in the first place.  And its purpose is to decide:  If the child is not to be reunited with the parent, what other option is in the child's best interest?  Our Legislature gives the juvenile courts a number of options (including guardianship and long-term foster care), but the presumptive (and hence preferred) option is to terminate the parent's rights over the child and place the child up for adoption. (§ 366.26, subd. (b)(1) [termination of parental rights and adoption is the first in the "order of preference"]; *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799 [noting the "strong preference for adoption"].)

7

Because it is possible—and, indeed, presumptively preferred—that a parent's legal ties to their progeny will be permanently severed at the permanency planning hearing, our Legislature has specified by statute how notice must be given for this particular type of hearing. That statute is section 294.

Section 294 first delineates to whom notice must be given— namely, to the child's mother, the child's father (whether alleged or presumed), the child himself or herself if they are at least 10 years old, to the counsel representing the parents and child, and to the child's current caregivers.[4] (§ 294, subd. (a)(1), (2), (4), (8), (10).) Section 294 then delineates what information the notice must contain—namely, the time, date, and location of the permanency planning hearing; the parent's right to appear and have counsel appointed; the nature of the proceeding (namely, that it is a permanency planning hearing where the court will "select a permanent plan of adoption"); and the recommendation of the supervising agency to the juvenile court regarding which plan to adopt. (§ 294, subd. (e).) As most pertinent here, section 294 also delineates the timing and methods for giving this notice.

---

[4] In various situations, additional or alternative notice must be given. Where a parent's whereabouts are unknown, section 294 requires notice to the grandparents and to the parents through notice by publication. (§ 294, subd. (a)(7), (9)). Where the child has a sibling who is or was under the juvenile court's dependency jurisdiction, section 294 requires that notice also be given to the sibling if they are at least 10 years old or to the sibling's attorney and caregiver if they are under 10. (*Id.*, subd. (a)(6).) Where there is reason to know that the child is an "Indian child" within the meaning of the Indian Child Welfare Act, section 294 requires notice also be given to the Indian custodian and the child's tribe. (*Id.*, subd. (a)(3), (5).)

When notice is to be served, that service must be completed 45 days before the hearing date (or 30 days before the hearing where notice is by publication). (§ 294, subd. (c).)

Section 294 does not take a one-size-fits-all approach to the method for giving notice of a permanency planning hearing. Instead, the statute starts by defining three general rules for effecting service depending upon whether the parent's whereabouts are unknown and whether the parent was present at the hearing where the permanency planning hearing was scheduled:

● If the parent is "present at the hearing at which the [juvenile] court schedules" the permanency planning hearing, then section 294 requires that (1) the court orally "advise the parent" of the upcoming hearing (including all of the necessary content set forth above) and "direct the parent to appear," and (2) the parent thereafter be sent a written notice "by first-class mail" or "by electronic service" (§ 294, subd. (f)(1)), or certified mail with return receipt requested if the parent resides out of state (*id.*, subd. (f)(5));

● If the parent is not present at the hearing when the permanency planning hearing is scheduled, then section 294 requires that the parent be (1) sent written notice by "[c]ertified mail, return receipt requested" (*id.*, subd. (f)(2), (5)), (2) personally served with the notice (*id.*, subd. (f)(3)), or (3) served via substituted service on a competent person at least 18 years old at the parent's residence or business, and thereafter sent written notice via first-class mail or via electronic service (*id.*, subd. (f)(4)); and

● If the parent's identity is known but "his or her whereabouts are unknown," then section 294 requires service to

9

be made on the parent's attorney of record or by publication and upon the child's grandparents, but only if the Department has exercised "reasonable diligence" in trying to locate and serve the parent. (§ 294, subd. (f)(7)(A).)

Section 294 then layers an additional proviso on top of these three general rules—namely, if the Department is recommending a plan *other than* the termination of parental rights, the strictness of notice is relaxed: If the parent's whereabouts are known but the parent did not attend the hearing where the permanency planning hearing was scheduled, service by first-class mail or electronic service will suffice (§ 294, subd. (f)(6)), and if the parent's whereabouts are unknown (after the exercise of due diligence), no further notice beyond notice to the grandparents is required (*id.*, subd. (a)(7)(B)).

**B.** *Constitutional notice requirements*

Because a parent's "interest . . . in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights," a parent may not be deprived of that interest through the termination of her parental rights unless she is accorded due process. (*In re B.G.* (1974) 11 Cal.3d 679, 688-689.) Due process entitles a parent to "adequate notice and an opportunity to be heard." (*Ibid.*; *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212.) Notice is adequate for due process purposes as long as it is "'reasonably calculated, under all the circumstances, to apprise [the parent] of the pendency of the action and afford them an opportunity to present their objections.'" (*In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418, quoting *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314.) This standard does not rigidly prescribe a specific form of notice; that is because due

10

process is, by its very nature, "flexible." (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 536.)

**II. Analysis**

We conclude that the juvenile court's order terminating mother's parental rights need not be vacated.

Even if we accept that the Department erred under section 294 and violated due process in sending mother notice via certified mail but without return receipt, mother is still not entitled to relief. That is because defects in notice—whether they be statutory or constitutional in nature—are subject to harmless error analysis except in the "narrow category" of cases in which the party charged with giving notice makes "absolutely" "no attempt" to do so. (*J.H.*, *supra*, 158 Cal.App.4th at p. 182; *In re J.P.* (2017) 15 Cal.App.5th 789, 798 ["The harmless error analysis applies in juvenile dependency proceedings even where the error is of constitutional dimension."]; *In re A.D.* (2011) 196 Cal.App.4th 1319, 1327; *In re Jesusa V.* (2004) 32 Cal.4th 588, 624 ["We typically apply a harmless-error analysis when a statutory mandate is disobeyed, except in a narrow category of circumstances . . ."]; *In re Daniel F.* (2021) 64 Cal.App.5th 701, 715-716 [where agency makes "little to no effort" to provide notice; harmless error analysis applied]; *In re Christopher L.* (2020) 56 Cal.App.5th 1172, 1185; *In re R.L.* (2016) 4 Cal.App.5th 125, 145-146; cf. *Jasmine G.*, *supra*, 127 Cal.App.4th at pp. 1115-1116 [where agency makes "no attempt" to provide notice to parent, error is structural and reversible per se without examination of whether error was harmless]; *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 108 [same].) In overwhelmingly favoring a harmless error analysis for defects in notice, the California courts have heeded the admonition of our Supreme

11

Court against an "unthinking" and "wholesale" application of a rule of automatic reversal; to hit the reset button and re-do a juvenile dependency proceeding without a predicate showing that the result could be different is to delay the stability and permanency that the children at the middle of the proceeding so desperately need, and such pointless delay is "inherently prejudicial" to those children. (*In re James F.* (2008) 42 Cal.4th 901, 917; *J.P.*, at pp. 799-800; *Jesusa V.*, at p. 625.)

The California courts are currently divided regarding the standard by which harmlessness is to be assessed. Some courts ask whether the defect in notice was harmless beyond a reasonable doubt. (*In re Steven H.* (2001) 86 Cal.App.4th 1023, 1033; *In re Mark A.* (2007) 156 Cal.App.4th 1124, 1146; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1419; *In re Justice P.* (2004) 123 Cal.App.4th 181, 193.) Other courts ask whether, had the defect in notice not occurred, there is a reasonable probability of a more favorable outcome. (*In re Al. J.* (2019) 44 Cal.App.5th 652, 665; *Daniel F.*, *supra*, 64 Cal.App.5th at pp. 715-716; accord, *Jesusa V.*, *supra*, 32 Cal.4th at p. 625.)

We need not weigh in on the split because any defect in the notice given to mother satisfies the more stringent harmless error test because the notice defect in this case was harmless beyond a reasonable doubt. As a threshold matter, we reject mother's argument that the notice defect in this case is reversible per se. The shortfall, if any, in the Department's effort to notify mother was its failure to request a return receipt; it is undisputed that the Department sent her notice via certified mail. This is far from a case where the Department made absolutely no attempt to notify mother of the upcoming permanency planning hearing.

Further, the defect in notice here was harmless beyond a reasonable doubt for two reasons.  First, based on mother's consistent pattern of opting not to attend prior dependency hearings even after receiving proper notice, there is no reason to believe mother would have attended the permanency planning hearings even if the Department had requested return receipts.  (Accord, *James F.*, *supra*, 42 Cal.4th at p. 917 [looking to what the party who did not receive proper notice "would have" done had they received proper notice].)  Second, and more broadly, there is no possibility that the outcome of the permanency planning hearing would have been any different had mother attended.  (E.g., *In re Angela C.* (2002) 99 Cal.App.4th 389, 395-396 [looking to whether the result of the hearing at issue would have been different].)  The sole issue at the permanency planning hearings in this case was (1) whether Sebastian and Nehemiah were adoptable, and (2) whether any exception to adoption applied.  There is no basis to contest that the children were adoptable and the record forecloses the applicability of the only relevant exception to adoption—namely, the beneficial parent-child relationship exception.  (§ 366.26, subds. (a) & (c)(1).)  This exception "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child," so a court will find the exception applicable only if the parent "establish[es]" "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630, 631, original italics.)  Over the two years and three months that the juvenile court

13

exerted jurisdiction in this case and that Sebastian or Nehemiah were removed from mother's custody, mother did not regularly visit or contact either child; her sporadic visits, interspersed with "significant lapses" in visits, do not meet the "regular visitation and contact" element.  (*In re A.G.*(2020) 58 Cal.App.5th 973, 994-995; *In re I.R.* (2014) 226 Cal.App.4th 201, 212.)  Nor could mother produce any evidence at the permanency planning hearings that would change this historical fact.  Indeed, mother on appeal offers no argument as to how her participation at the hearings would have had any effect on their outcome.  As a result, any defect in notice in this case was harmless beyond a reasonable doubt.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ

14